8 U.S. 241 (____)
4 Cranch 241
ROSE
v.
HIMELY.
Supreme Court of United States.

*243 For the libellant, the case was argued by C. Lee, Harper, S. Chase, jun. Dallas, Rawle, Ingersoll, and Drayton, and
For the respondent, by Duponceau, E. Tilghman, and Martin.[*]
*268 MARSHALL, Ch. J. delivered the opinion of the court.
This is a claim for a cargo of coffee, &c. which, after being shipped from a port in Santo Domingo, in possession of the brigands, was captured by a French privateer, and carried into Barracoa, a small port in the island of Cuba, where it was sold by the captor. The cargo, having been brought by the purchaser into the state of South Carolina, was libelled in the court of admiralty, by the original American owner. The purchaser defends his title by a sentence of condemnation pronounced by a tribunal sitting in Santo Domingo, after the property had been libelled in the court of this country; and by an order of sale made by a person styling himself delegate of the French government of Santo Domingo at St. Jago de Cuba.
The great question to be decided is,
Was this sentence pronounced by a court of competent jurisdiction?
At the threshold of this interesting inquiry, a difficulty presents itself, which is of no inconsiderable magnitude. It is this.
Can this court examine the jurisdiction of a foreign tribunal?
The court pronouncing the sentence, of necessity decided in favour of its jurisdiction; and if the decision was erroneous, that error, it is said, ought to be corrected by the superior tribunals of its own country, not by those of a foreign country.
This proposition certainly cannot be admitted in its full extent. A sentence professing on its face to be the sentence of a judicial tribunal, if rendered by a selfconstituted *269 body, or by a body not empowered by its government to take cognizance of the subject it had decided, could have no legal effect whatever.
The power of the court then is, of necessity, examinable to a certain extent by that tribunal which is compelled to decide whether its sentence has changed the right of property. The power, under which it acts, must be looked into; and its authority to decide questions, which it professes to decide, must be considered.
But although the general power by which a court takes jurisdiction of causes must be inspected, in order to determine whether it may rightfully do what it professes to do, it is still a question of serious difficulty, whether the situation of the particular thing on which the sentence has passed, may be inquired into, for the purpose of deciding whether that thing was in a state which subjected it to the jurisdiction of the court passing the sentence. For example; in every case of a foreign sentence condemning a vessel as prize of war, the authority of the tribunal to act as a prize court must be examinable. Is the question, whether the vessel condemned was in a situation to subject her to the jurisdiction of that court, also examinable? This question, in the opinion of the court, must be answered in the affirmative.
Upon principle, it would seem that the operation of every judgment must depend on the power of the court to render that judgment; or in other words, on its jurisdiction over the subject-matter which it has determined. In some cases, that jurisdiction unquestionably depends as well on the state of the thing, as on the constitution of the court. If by any means whatever a prize court should be induced to condemn, as prize of war, a vessel which was never captured, it could not be contended that this condemnation operated a change of property. Upon principle, then, it would seem that, to a certain extent, the capacity of the court to act upon the thing condemned, arising from its being within, or without their jurisdiction, as well as the constitution of the court, may be considered by that tribunal which is to decide on the effect of the sentence.
*270 Passing from principle to authority, we find, that in the courts of England, whose decisions are particularly mentioned, because we are best acquainted with them, and because, as is believed, they give to foreign sentences as full effect as are given to them in any part of the civilized world, the position that the sentence of a foreign court is conclusive with respect to what it professes to decide, is uniformly qualified with the limitation that it has, in the given case, jurisdiction of the subject-matter.
This general dictum is explained by particular cases.
The case of the Flad Oyen, 1 Rob. 114. was a vessel condemned by a belligerent court sitting in a neutral territory; consequently, the objection to that sentence turned entirely on the defect in the constitution of the court.
The Christopher, 2 Rob. 173. was condemned while lying in the port of an ally. The jurisdiction of the court passing the sentence was affirmed, but no doubt seems to have been entertained, at the bar, or by the judge himself, of his right to decide the question, whether a court of admiralty sitting in the country of the captor could take jurisdiction of a prize lying in the port of an ally. The decision of the tribunal at Bayonne in favour of its own jurisdiction, was not considered as conclusive on the court of admiralty in England, but that question was considered as being perfectly open, and as depending on the law of nations.
The case of The Kierlighett, 3 Rob. 82. is of the same description with that of The Christopher, and establishes the same principle.
In the case of The Henrick and Maria, 4 Rob. 35. Sir W. Scott determined that a condemnation, by the court of the captor, of a vessel lying in a neutral port, was conformable to the practice of nations, and therefore valid; but in that case the right to inquire whether the situation of the thing, the locus in quo, did not take it out of the jurisdiction of the court, was considered as unquestionable.
*271 The case of The Comet, 5 Rob. 255. stands on the same principles.
The Helena, 4 Rob. 3. was a British vessel captured by an Algerine corsair owned by the Dey, and transferred to a Spanish purchaser by a public act in solemn manner before the Spanish consul. The transfer was guarantied by the Dey himself. The vessel was again transferred to a British purchaser under the public sanction of the judge of the vice-admiralty court of Minorca, after that place had surrendered to the British arms. On a claim in the court of admiralty by the original British owner, Sir W. Scott affirmed the title of the purchaser, but expressed no doubt of the right of the court to investigate the subject.
The manner in which this subject is understood in the courts of England, may then be considered as established on uncontrovertible authority. Although no case has been found in which the validity of a foreign sentence has been denied, because the thing was not within the ports of the captor, yet it is apparent that the courts of that country hold themselves warranted in examining the jurisdiction of a foreign court, by which a sentence of condemnation has passed, not only in relation to the constitutional powers of the court, but also in relation to the situation of the thing on which those powers are exercised; at least so far as the right of the foreign court to take jurisdiction of the thing is regulated by the law of nations and by treaties. There is no reason to suppose that the tribunals of any other country whatever deny themselves the same power. It is, therefore, at present, considered as the uniform practice of civilized nations, and is adopted by this court as the true principle which ought to govern in this case.
In pursuing the inquiry, then, whether the tribunal erected in St. Domingo was acting on a case of which it had jurisdiction when The Sarah was condemned, this court will examine the constitutional powers of that tribunal, the character in which it acted, and the situation of the subject on which it acted.
*272 Admitting that the ordinary tribunal erected in St. Domingo was capable of acting as a prize court, and also of taking cognizance of offences against regulations purely municipal, it is material to inquire in which character it pronounced the sentence of condemnation in the case now under consideration.
In making this inquiry, the relative situation of St. Domingo and France must necessarily be considered.
The colony of St. Domingo originally belonging to France, had broken the bond which connected her with the parent state, had declared herself independent, and was endeavouring to support that independence by arms. France still asserted her claim of sovereignty, and had employed a military force in support of that claim. A war de facto then unquestionably existed between France and St. Domingo. It has been argued that the colony, having declared itself a sovereign state, and having thus far maintained its sovereignty by arms, must be considered and treated by other nations as sovereign in fact, and as being entitled to maintain the same intercourse with the world that is maintained by other belligerent nations. In support of this argument, the doctrines of Vattel have been particularly referred to. But the language of that writer is obviously addressed to sovereigns, not to courts. It is for governments to decide whether they will consider St. Domingo as an independent nation, and until such decision shall be made, or France shall relinquish her claim, courts of justice must consider the ancient state of things as remaining unaltered, and the sovereign power of France over that colony as still subsisting.
It is not intended to say that belligerent rights may not be superadded to those of sovereignty. But admitting a sovereign who is endeavouring to reduce his revolted subjects to obedience, to possess both sovereign and belligerent rights, and to be capable of acting in either character, the manner in which he acts must determine the character of the act. If as a legislator he publishes a law ordaining punishments for certain offences, which law is to be applied by courts, the nature of the law, and of the proceedings under it, will *273 decide whether it is an exercise of belligerent rights, or exclusively of his sovereign power; and whether the court, in applying this law to particular cases, acts as a prize court, or as a court enforcing municipal regulations.
Let the acts of the French government which relate to this subject be inspected.
The notification given by Mr. Pichon, the French charge d'affaires to the American government, which was published in March, 1802, interdicts all manner of intercourse with the ports of St. Domingo, in possession of the revolted negroes, and declares that "cruisers will arrest all foreign vessels attempting to enter any other port, and to communicate with any of the revolted negroes, to carry either ammunition or provisions to them. Such vessels," he adds, "shall be confiscated, and the commanders severely punished, as violating the rights of the French Republic, and the law of nations."
It might be questioned, under this notice, whether vessels sailing on the high seas, having traded with one of the brigand ports, would be considered as liable to seizure and to confiscation, after passing the territorial jurisdiction of the government of St. Domingo. A free trade with that colony had been allowed, and the revocation of that license is made known to the government of the United States. To its revocation the ordinary rights of sovereignty alone were sufficient. The notification, however, refers to the order of the commander in chief of the French Republic in St. Domingo; and that order would of course be examined as exhibiting more perfectly the extent and the nature of the rights which the French Republic purposed to exercise.
The particular order which preceded this notification is in these words: "Every vessel, French or foreign, which shal be found by the vessels of the Republic riding at anchor in the ports of the island not designated by these presents, or within the bays, creeks, and landing places on the coast, or under sail at a less distance *274 than two leagues from the coast, and communicating with the land, shall be forfeited."
The next decree is dated the 22d of June, 1802, and the extract which is supposed to regulate this particular subject, is in these words: "Every vessel, French or foreign, which shall be found by the vessels of the Republic anchored in one of the ports of the island, not designated by the present decree, or in the bays, coves, or landings of the coast, or under sail at a less distance than two leagues from the coast, and communicating with the land, shall be arrested and confiscated."
Nothing can be more obvious than that these are strictly territorial regulations, proceeding from the sovereign power of St. Domingo, and intended to enforce sovereign rights. Seizure for a breach of this law is to be made only within those limits over which the sovereign claimed a right to legislate, in virtue of that exclusive dominion which every nation possesses within its own territory, and within such a distance from the land as may be considered as a part of its territory. This power is the same in peace and in war, and is exercised according to the discretion of the sovereign. The prohibition and the penalty are the same on French and foreign vessels.
This subject was again taken up in October, 1802, in an arrete, which in part regulates the coasting trade of the island. The 4th, 5th and 6th articles of this decree respect foreign as well as French vessels, and subject them to confiscation in the cases which are there enumerated.
These are all of the same description with those stated in the arrete of the 22d of June; and no seizure is authorised but of vessels found within two leagues of the coast.
The last decree is that which was issued by General Ferrand on the 1st of March, 1804. This deserves the more attention, because it is that on which the courts profess to found their sentence of condemnation, in the particular case under consideration, and because General *275 Ferrand uses expressions which clearly indicate the point of view in which all these arretes were contemplated by the government of the island.
The title of this arrete is, "An arrete relative to vessels taken in contravention of the dispositions of the laws and regulations concerning French and foreign commerce in the colony."
In stating the motives for this ordinance, it is said, "That some French agents in the neighbouring and allied islands had mistaken the application of the laws and regulations concerning vessels taken in contravention, upon the coasts of St. Domingo occupied by the rebels, and had confounded those prizes with those which were made upon the enemy of the state." "Desiring to put an end to all the abuses which might result from this mistake, and which would be as injurious to the territorial sovereignty as to the rights of neutrality," the commander in chief, after some further recitals, which are not deemed material, ordains the law under which the tribunals have proceeded.
The distinction, between seizures made in right of war, and those which are made for infractions of the commercial regulations established by the sovereign power of the state, is here taken in terms; and that legislation, which was directed against vessels contravening the laws and regulations concerning French and foreign commerce in the colony, is clearly of the latter description.
The first article of this ordonnance is recited in the sentence, as that on which the condemnation is founded. It is in these words:
"The port of Santo Domingo is the only one in the colony of St. Domingo that is open to the French and foreign commerce; in consequence, all vessels anchored in the bays, harbours, and landing places, on the coast occupied by the rebels, those cleared for the ports in their possession coming out with or without a cargo, and, generally, all vessels sailing in the territorial extent of the island, (except that from Cape Raphael to *276 Ocoa bay,) found at a distance less than two leagues from the coast, shall be detained by the state vessels and privateers having our letters of marque, who shall conduct them, if possible, into the port of Santo Domingo, that the confiscation of the said vessels and cargoes may be pronounced."
As this article authorises a seizure of those vessels only which are "sailing within the territorial extent of the island, found within less than two leagues of the coast," it is deemed by the court to be sufficiently evident that the seizure and confiscation are made in consequence of a violation of municipal regulation, and not in right of war. It is true that the revolt of the colony is the motive for this exercise of sovereign power. Still it is an exercise of sovereign power, restricting itself within those limits which are the province of municipal law, not the exercise of a belligerent right.
The tribunal professing to carry this law into execution, though capable of sitting either as a prize or an instance court, must be considered in this case as acting in the character of an instance court, since it is in that character that it punishes violations of municipal law.
The Sarah was captured more than ten leagues from the coast of St. Domingo, was never carried within the jurisdiction of the tribunal of that colony, was sold at Barracoa, in the island of Cuba, and afterwards condemned as prize under the arrete of General Ferrand, which has been stated.
If the court of St. Domingo had jurisdiction of the case, its sentence is conclusive. If it had no jurisdiction, the proceedings are coram non judice, and must be disregarded.
Of its own jurisdiction, so far as depends on municipal rules, the court of a foreign nation must judge, and its decision must be respected. But if it exercises a jurisdiction which, according to the law of nations, its sovereign could not confer, however available its sentences may be within the dominions of the prince from whom the authority is derived, they are not regarded *277 by foreign courts. This distinction is taken upon this principle, that the law of nations is the law of all tribunals in the society of nations, and is supposed to be equally understood by all.
Thus the sentence of a court sitting in a neutral territory, and instituted by a belligerent; has been declared not to change the property it professed to condemn; and thus the question whether a prize court sitting in the country of the captor could condemn property lying in a neutral port, has been fully examined, and although the jurisdiction of the court in such case was admitted, yet no doubt appears to have been entertained of the propriety of examining the question, and deciding it according to the practice of nations.
Since courts, who are required to decide whether the condemnation of a vessel and cargo by a foreign tribunal has effected a change of property, may inquire whether the sentence was pronounced by a court which, according to the principles of national law, could have jurisdiction over the subject; this court must inquire whether, in conformity with that law, the tribunal sitting at St. Domingo to punish violations of the municipal laws enacted by its sovereign, could take jurisdiction of a vessel seized on the high seas, for infracting those laws, and carried into a foreign port.
In prosecuting this inquiry, the first question which presents itself to the mind is, what act gives an inchoate jurisdiction to a court?
It cannot be the offence itself. It is repugnant to every idea of a proceeding in rem, to act against a thing which is not in the power of the sovereign under whose authority the court proceeds; and no nation will admit that its property should be absolutely changed, while remaining in its own possession, by a sentence which is entirely ex parte. Those on board a vessel are supposed to represent all who are interested in it, and if placed in a situation which requires them to take notice of any proceedings against a vessel and cargo, and enables them to assert the rights of the interested, the cause is considered as being properly heard, and all concerned *278 are parties to it. But the owners of vessels navigating the high seas or lying in port, cannot take notice of any proceedings which may be instituted against those vessels in foreign countries; and consequently, such proceedings would be entirely ex parte, and a sentence founded on them never would be, and never ought to be, regarded.
The offence then alleged to have been committed by The Sarah, could not be cognizable by the court of St. Domingo, until some other act was performed which should make the owners of the vessel and cargo parties to the proceedings instituted against them, and should place them within the legitimate power of the sovereign, for the infraction of whose laws they were to be confiscated. There must then be a seizure, in order to vest the possession of the thing in the offended sovereign, and enable his courts to proceed against it. This seizure, if made either by a civil officer, or a cruiser acting under the authority of the sovereign, vests the possession in him, and enables him to inquire, by his tribunals constituted for the purpose, into the allegations made against, and in favour of the offending vessel. Those interested in the property which has been seized are considered as parties to this inquiry, and all nations admit that the sentence, whether correct or otherwise, is conclusive.
Will a seizure de facto, made without the territorial dominion of the sovereign under cover of whose authority it is made, give a court jurisdiction of a thing never brought within the dominions of that sovereign?
This is a question upon which considerable difficulty has been felt, and on which some contrariety of opinion exists. It has been doubted whether proceedings, denominated judicial, are, in such a case, merely irregular, or are to be considered as absolutely void, being coram non judice. If merely irregular, the courts of the country pronouncing the sentence were the exclusive judges of that irregularity, and their decision binds the world; if coram non judice, the sentence is as if not pronounced.
*279 It is conceded that the legislation of every country is territorial; that beyond its own territory, it can only affect its own subjects or citizens. It is not easy to conceive a power to execute a municipal law, or to enforce obedience to that law without the circle in which that law operates. A power to seize for the infraction of a law is derived from the sovereign, and must be exercised, it would seem, within those limits which circumscribe the sovereign power. The rights of war may be exercised on the high seas, because war is carried on upon the high seas; but the pacific rights of sovereignty must be exercised within the territory of the sovereign.
If these propositions be true, a seizure of a person not a subject, or of a vessel not belonging to a subject, made on the high seas, for the breach of a municipal regulation, is an act which the sovereign cannot authorise. The person who makes this seizure, then, makes it on a pretext which, if true, will not justify the act, and is a marine trespasser. To a majority of the court it seems to follow, that such a seizure is totally invalid; that the possession, acquired by this unlawful act, is his own possession, not that of the sovereign; and that such possession confers no jurisdiction on the court of the country to which the captor belongs.
This having been the fact in the case of The Sarah, and neither the vessel, nor the captain, supercargo, nor crew, having ever been brought within the jurisdiction of the court, or within the dominion of the sovereign whose laws were infracted, the jurisdiction of the court over the subject of its sentence never attached, the proceedings were entirely ex parte, and the sentence is not to be regarded.
The case of The Helena, already cited, may at first view be thought a case which would give validity to any seizure wherever made, and would refer the legality of that seizure solely to the sovereign of the captor. But on a deliberate consideration of that case, the majority of the court is of opinion that this inference is not warranted by it. Several circumstances concurred in producing *280 the decision which was made, and those circumstances vary that case materially from this. The captured vessel was carried into port, and while in the power of the sovereign was transferred by his particular authority in solemn form.
In such a case, Sir W. Scott conceived that a sentence of confiscation conformably with the laws of Algiers, was to be presumed. But his decision did not turn singly on this point. The vessel, after passing in this formal manner to a Spanish purchaser, had, with equal solemnity, been again transferred to a British purchaser; and the judge considered this second purchaser, with how much reason may perhaps be doubted, as in a better situation than the original purchaser. This case is badly reported, the points made by counsel on one side are totally omitted, and the opinion of the judge is not given with that clearness which usually characterizes the opinions of Sir William Scott. But the seizure was presumed to be made by way of reprisals for some breach of the treaty between the two powers, so that the possession of the captor was considered as legitimately the possession of his sovereign, and from the subsequent conduct of the Dey himself, a condemnation according to the usages of Algiers was presumed.
But in presuming a condemnation, this case does not, it is thought, dispense with the necessity of one; nor is it supposed, in presuming a legitimate cause of seizure, to declare that a seizure made without authority, by a commissioned cruiser, would vest the possession in the sovereign of the captor, and give jurisdiction to his courts.
If this case is to be considered as if no sentence of condemnation was ever pronounced, the property is not changed, and this court, having no right to enforce the penal laws of a foreign country, cannot inquire into any infraction of those laws. The property in this particular case was purchased under circumstances which exclude any doubt respecting its identity, and respecting the full knowledge of the purchaser of the nature of the title he acquired.
*281 The sentence of condemnation being considered as null and invalid, the property is unchanged, and therefore ought to be recovered by the libellants in the court below. But those libellants ought to account with the defendants for the freight, insurance, and duties on importation, and for such other expenses as would have been properly chargeable on themselves as importers; and each party is to bear his own costs.
The sentence of the circuit court is to be reversed, and also the sentence of the district court, so far as it contravenes this opinion, and the cause is to be remanded to the circuit court for the district of South Carolina, for a final decision thereon.
LIVINGSTON, J.
Without expressing an opinion on the invalidity of a seizure on the high seas under a municipal regulation, if the property be immediately carried into a port of the country to which the capturing vessel belongs, and there regularly proceeded against, I concur in the judgment just delivered, because The Sarah and her cargo were condemned by a French tribunal sitting at St. Domingo, without having been carried into that, or any other French port, and while lying in the port of Charleston, South Carolina, whither they had been carried, by and with the consent of the captor.
CUSHING and CHASE, Justices, concurred in opinion with Judge Livingston.
JOHNSON, J.
This cause comes up on appeal from the circuit court of South Carolina, acting in the capacity of an instance court of admiralty. The doctrines which regulated the decision of the circuit court, are not overruled by a majority of the bench; but the decree of that court is rescinded, because to three of the five judges who concur in sustaining the appeal, it appears that the property could not be condemned in the court of St. Domingo, while lying in a neutral port: and to the other two, that the capture on the high seas, for a breach of municipal regulation, was contrary to the law of nations, and therefore vested no jurisdiction in the court of St. Domingo. On the former doctrine it is not *282 necessary to make any observations, because in the case of the Sea-flower, argued together with this as one cause, and decided on the same day, that doctrine is expressly overruled. But on the latter point I think it proper, briefly to state the reasons upon which I found my disapprobation, both of the doctrine and of its application to this case.
It would have been some relief to us in determining this question, had it been made a point by counsel, either in their argument in this court, or in the court below; but it appears to have been wholly unnoticed by them.
Most of the difficulties which have occurred in the investigation of this case, appear to have resulted from an indistinct view of the nature, origin, and object of prize courts. Conducted by the same forms, and very generally blended in the same persons, it is not easy to trace upon the mind, the discriminating line between the instance and prize courts; yet the object of the institution of the latter court, when considered, strongly marks the distinguishing point between them. In its ordinary jurisdiction, the admiralty takes cognizance of mere questions of meum and tuum arising between individuals; its extraordinary or prize jurisdiction is vested in it for the purpose of revising the acts of the sovereign himself performed through the agency of his officers or subjects. A seizure on the high seas by an unauthorised individual, is a mere trespass, and produces no change of right, but such a seizure made by sovereign authority, vests the thing seized in the sovereign; for the fact of possession must have all the beneficial effects of the right of possession, as the justice or propriety of it cannot be inquired into by the courts of other nations. But as this principle might leave the unoffending individual a prey to the rapacity of cruisers, or a victim to the errors of those who even mean well, and as every civilized nation pretends to the character of justice and moderation, and to have an interest in preserving the peace of the world, they constitute courts with powers to inquire into the correctness of captures made under colour of their own authority, and to give redress to those who have been unmeritedly attacked or injured. These are denominated prize courts, and the primary *283 object of their institution, is to inquire whether a taking as prize, is sanctioned by the authority of their sovereign, or the unauthorised act of an individual. From this it would seem to follow, that the decision of such a court, is the only legal organ of communication, through which the sanction of a sovereign can be ascertained, and that no other court is at liberty to deny the existence of sovereign authority, for a seizure which a prize court has declared to be the act of its sovereign.
The propriety of such an act may correctly become the subject of executive or diplomatic discussion; but the equality of nations forbids that the conduct of one sovereign, or the correctness of the principles upon which he acts, should be submitted to the jurisdiction of the courts of another. From these considerations I infer, that the capture and continued possession of The Sarah and her cargo, confirmed by the approbatory sentence of a court of the capturing power, vested a title in the claimant, which this court cannot, consistently with the law of nations, interpose its authority to defeat.
Having briefly stated the grounds upon which I originally formed, and now adhere to an opinion in favour of the claimants, I will consider the objections stated to the jurisdiction of the court, on the ground that the seizure was contrary to the law of nations.
It is admitted, if the court of St. Domingo had jurisdiction of the subject matter, that the condemnation completed the divestiture of property. But it is contended that the subject, in this case, was not within their jurisdiction, because it was seized for a cause not sanctioned by the law of nations. I am unfortunate enough to think that neither the premises nor the conclusion of this argument, are maintainable. The conclusion is subject to this very obvious objection, that it defeats the very end for which such courts were created.
To contend that a violation of the law of nations will take away the jurisdiction of a court, which sits and judges according to the law of nations, appears to approach very near to a solecism. The occurrence which gives it jurisdiction, takes it away.
*284 If the object and end of constituting a prize court be to give redress against unlawful capture, and, as the books say, in such case to restore velis levatis, how can it make reparation to the injured individual if it loses its jurisdiction; because there has been an injury done to him, the court can give him no redress. The argument admits, that a capture consistent with the law of nations, would give jurisdiction, but how is the legality or illegality of a capture to be determined, unless a court can take jurisdiction of the case. The legality of the capture is the very point to which a court is to direct its inquiries, and yet that inquiry is arrested in its inception. The cause or circumstances of a capture can never be known to a court, without exercising jurisdiction on the subject. To maintain therefore, that prize courts can only exercise jurisdiction over captures, made consistently with the law of nations is, in effect, to deprive them of all jurisdiction, since it leaves no means of deciding the question on which their jurisdiction rests.
But the premises which lead to this conclusion, will be found no less exceptionable than the conclusion itself; and the propriety of taking into consideration the questions which form those premises very questionable. The opinion of those of my brethren who maintain this doctrine, is founded upon two propositions.
1. That a nation cannot capture, on the high seas, a vessel which has within her territories, committed a breach of a municipal law.
2. That the condemnation in this case, was grounded on an offence against a municipal law.
To me it appears wholly immaterial on what grounds the decision be founded, if the case be within their jurisdiction. Indeed, this is fully admitted by those of the court, who maintain the doctrine that I am considering; but under the idea of examining the jurisdiction of the court, they appear to me to go farther and examine into the correctness of its decision. I do not deny that there are circumstances material to the effect of sentenecs of foreign prize courts, into which other courts may *285 inquire. The authorities quoted on this point relate exclusively to two, viz.
1. Whether the court is held in the territory of the sovereign who constitutes it.
2. Whether the subject was sub potestate of the sovereign whose courts condemned it.
These circumstances have an immediate relation to the existence of the court, and of its power of acting upon the subject; but within its legitimate scope of action, the correctness of its proceedings, or of the rules of decision by which it is governed, cannot, in the nature of things, and consistently with the idea of perfect equality and independence, be subjected to the review of other courts.
The decisions of such courts do not derive their effect from their abstract justice; they are in this respect analogous to the acts of sovereignty. They are universally conclusive, because no where subject to revision. Among nations they are considered as entitled to the same validity as the decisions of municipal courts, within their respective territories, and preclude the rights of parties, although contrary to every idea of law, reason and evidence.
The court of St. Domingo being a court of co-ordinate authority with this, was equally competent to decide a question of jurisdiction arising under the law of nations. Had the question whether a seizure under municipal law, upon the high seas, was contrary to the law of nations  or, if contrary to the law of nations, whether the court could not therefore exercise jurisdiction upon it, been brought to the notice of that court, it is presumed that their decree would not have been void, because they maintained the negative of the proposition. Had it been made a question before that court, whether the laws of France authorised the capture of The Sarah at ten leagues distance from the coast, or whether in fact the vessel was not seized within two leagues of the coast, it is presumed that their decision upon these points would have been conclusive, whatever may be the impression *286 of this court from the evidence now before us. It is impossible for this court to pretend to a knowledge of all the facts by which the decree of that court may have been regulated. The decree itself shows that the whole evidence is not before us; but if it were, that court is sole arbiter, both of the effect of testimony, and the credibility of witnesses. A similar observation may be made with regard to the laws of France, which much pains has been taken to prove, did not authorise this capture. How can this court be supposed to know all the laws, sovereign orders, or received principles which regulate the decisions of foreign courts. Such courts are best acquainted with the laws of their own government, and their decision upon the existence or effect of those laws must, in the nature of things, be conclusive in the eyes of other nations. Suppose that other courts were so far at liberty as to review the grounds upon which such decrees profess to proceed, the insufficiency of those grounds would not be conclusive against the correctness of such decisions, because they may be maintainable upon other grounds, not noticed, or even not known to the judge who pronounces them.
But if we are to look into the grounds upon which a decree is professedly founded, extravagant as that upon the case of The Sarah is said to be, there is one view in which it may admit of justification. General Ferrand in his preamble declares it to be his leading object to remove the contrariety of opinion which existed among the officers of government relative to existing laws, respecting captures of vessels taken upon the coasts of St. Domingo. If their judges thought proper to consider this arrete as only declaratory of pre-existing laws, and that the words in the first article, "ceux expedié "pour les portes en leur possession en sortant avec ou "sans chargement," authorised the capture of vessels outward bound, I know no reason that we can have to declare it a misconstruction or incorrect opinion, or, if incorrect, to nullify their decree on that account. The conclusiveness of a foreign sentence appears to be at an end, the moment other courts undertake to look into the cause for which a capture was made. If the possession of the captor is the possession of his sovereign, and his courts have a right therefore to adjudicate property captured, *287 or carried into a foreign port, it appears to me to be immaterial on what ground the capture is made. The fact of dispossession by sovereign authority, judicially ascertained, deprives all other courts of the right to act upon the case.
Upon these considerations I have adopted the opinion that we are not at liberty to enter into the inquiry, whether the capture of The Sarah was made in pursuance of belligerent or municipal rights. But if we are to enter into the inquiry, I am of opinion that the evidence before us plainly makes out a case of belligerent capture, and, though not so, that the capture may be justified, although for the breach of a municipal law.
In support of my latter position, both principle, and the practice of Great Britain and our own government may be appealed to.
The ocean is the common jurisdiction of all sovereign powers; from which it does not result that their powers upon the ocean exist in a state of suspension or equipoise, but that every power is at liberty upon the ocean to exercise its sovereign right, provided it, does no act inconsistent with that general equality of nations which exists upon the ocean. The seizure of a ship upon the high seas, after she has committed an act of forfeiture within a territory, is not inconsistent with the sovereign rights of the nation to which she belongs, because it is the law of reason, and the general understanding of nations, that the offending individual forfeits his claim to protection, and every nation is the legal avenger of its own wrongs. Within their jurisdictional limits the rights of sovereignty are exclusive; upon the ocean they are concurrent. Whatever the great principle of self defence in its reasonable and necessary exercise will sanction in an individual in a state of nature, nations may lawfully perform upon the ocean. This principle, as well as most others, may be carried to an unreasonable extent; it may be made the pretence instead of the real ground of aggression, and then it will become a just cause of war. I contend only for its reasonable exercise. The act of Great Britain, of the 24 Geo. III. c. 47. is predicated upon these principles. It subjects vessels to *288 seizure, which approach with certain cargoes on board, within the distance of four leagues of her coast, because it would be difficult, it not impossible to execute her trade laws, if they were suffered to approach nearer in the prosecution of an illicit design. But it they have been within that distance, they are afterwards subject to be seized on the high seas. They have then violated her laws and have forfeited the protection of their sovereign. The laws of the United States upon the subject of trade, appear to have been framed in some measure after the model of the English statutes; and the 29th section of the act of 1799, expressly authorises the seizure of a vessel that has, within the jurisdiction of the United States, committed an act of forfeiture, wherever she may be met with by a revenue cutter, without limiting the distance from the coast. So also the act of 1806, for prohibiting the importation of slaves, authorises a seizure beyond our jurisdictional limits, if the vessel be found with slaves on board, hovering on the coast; a latitude of expression that can only be limited by circumstances, and the discretion of a court, and in case of fresh pursuit, would be actually without limitation. Indeed, after passing the jurisdictional limits of a state, a vessel is as much on the high seas as if in the middle of the ocean; and if France could authorise a seizure at the distance of two leagues, she could at the distance of twenty.
But the capture of The Sarah may fairly be considered as an exercise of belligerent right, and strictly analogous to seizure for breach of blockade. The right of one nation to exclude all others from trading with her territories, exists equally in war and in peace. Had the exclusion in this case been merely calculated for the interests of trade, it may have been considered as purely municipal. But there existed a war between the parent state and her colony. It was not only a fact of the most universal notoriety, but officially notified in the gazettes of the United States, by the proclamation of the French resident M. Pichon, who at the same time publishes the prohibition to trade with the revolters, with a declaration that seizure and confiscation should be the consequence of disobedience to this prohibition. Here then was notice of the existence of war, and an assertion *289 of the rights consequent upon it. The object of the measure was not the promotion of any particular branch of agriculture, manufacture, or commerce, but solely the reduction of an enemy. It was therefore not merely municipal, but belligerent in its nature and object. If France had a right to subdue the revolted colony, she had an undoubted right to preclude all nations from supplying them with the means of protracting the war. To confine her to her own jurisdictional limits, in the exercise of those acts of force which were necessary to carry into effect her right of excluding neutrals, would be a mere mockery, when by the very state of things she was herself shut out from those limits. Seizure on the high seas for a breach of the right of blockade, during the whole return voyage, is universally acquiesced in as a reasonable exercise of sovereign power. The principle of blockade has indeed in modern times been pushed to such an extravagant extent as to become a very justifiable cause of war, but still it is admitted to be consistent with the law of nations, when confined within the limits of reason and necessity. The right to subdue an enemy, carries with it the right to make use of the necessary means for that purpose, and the individual who does an act inconsistent with the rights of a belligerent, exposes himself to the liability to be treated as an enemy. The belligerent nation can exercise the same acts of violence against him that she can against an individual of her enemy. Nor can his sovereign protect an individual who has committed an aggression upon belligerent rights without becoming a party to the contest.
The argument drawn from the decree of Ferrand, to prove that France had not asserted her belligerent rights, is evidently founded upon a mistranslation. The sentence which authorises the seizure of vessels when outward bound, after having entered the ports of St. Domingo, is substantive, and totally unaffected by the subsequent sentence, which authorises a seizure of vessels sailing within two leagues of the coast. The former authorises capture for the offence of having entered those ports; the latter, for being found in a situation from which an intention to commit that offence shall be inferred. Nor, if the fact were so, that she had limited the right of capture to two leagues from her coast, would *290 it follow that this was an exercise of municipal right; because a nation may restrict her subjects, in the exercise of belligerent rights, to a certain distance from the coast, or even to her jurisdictional limits, and yet the character of the seizure would be in no wise changed. If the object of the seizure is to promote the reduction of an enemy, it is an exercise of the rights of war.
From these considerations I conclude that the capture of The Sarah was justifiable upon principles not at all dependent upon municipal regulation; that it may fairly be considered as having been made in conformity with the law of nations, and, therefore, without acceding to the doctrine that a seizure contrary to the law of nations was a void seizure, and that we have a right to declare that a mere marine trespass which a court of France has declared to be the act of its sovereign, I conclude that the court of St. Domingo had jurisdiction in this case; and if it had jurisdiction, it is admitted that the property was altered, and the libellant ought not to recover.
Let it be observed that this is not an application on behalf of the vendee of the captor for the aid of this court to secure to him the benefit of his purchase. We find him in possession, and the application is for our aid to divest that possession, and restore it to the original owner. This owner was clearly an offender against the rights of France, and his only claim upon the interference of this court is, that he had escaped, with the property thus acquired, beyond two leagues from the shore of the nation that he had offended. In such a case it would be enough for all the purposes of the defendant, if this court would imitate the state of our nation, and remain neutral between the parties.
Let it not be supposed that the opinion which I am giving devotes the commerce of our country to lawless depredation. My observations are applied to a case in which an evident aggression has been committed, by entering at least two of the interdicted ports of St. Domingo. The individual who will knowingly violate the rights of war, or laws of trade of another nation, is well apprised that he forfeits all claim to the protection of his country, or the interference of its courts. The peace of *291 the nation, and the interests of the fair trader, imperiously require that the smuggler, or the violator of neutrality, should be left to his fate.
If I had no other reason to satisfy my mind of the correctness of the doctrines that I have been contending for, a conviction of their importance to the peace and security of the mercantile world would alone induce me to maintain them. The purchase of these goods was made in a Spanish port, under sanction of an agent of the French government, apparently countenanced by the government of the country in which he acted, and is sanctioned by a condemnation. If in the purchase of articles of merchandize in a foreign port, under the sanction of sovereign authority, it is nevertheless necessary, in order to acquire a good property, that a merchant should know whether they were captured by law or without law, under the law of nations, or under municipal law, the office of a lawyer will be as necessary to his education as the counting house. Articles of commerce passing from hand to hand by mere delivery, often remaining for years in the same packages, distinguished by the same marks, may admit of identification after any length of time, in the remotest countries, and in the hands of the most innocent purchasers. But if a seizure by a sovereign, upon a ground which any court may adjudge unsanctioned by the law of nations, is tantamount to no seizure, and nothing done in pursuance of it can transfer a good property, where is the uncertainty to end? With regard to ships the inconvenience may not be so great. Every merchant knows that a vessel must be accompanied with her document papers, so that the purchaser may come to the knowledge of her having passed through a capture and condemnation, and be put on his guard against so precarious a title. He will know that he is liable to be dispossessed according to the varying constructions of the law of nations that may prevail in different countries; yet he knows the full value of a property thus embarrassed. But in the purchase of merchandize he has no security, unless indeed he purchases them immediately from the manufacturer or the planter. It is a subject of curious speculation how far the pursuit or research after merchandize thus situated may be carried; whether the same principle may not extend it into the *292 hands of the retailer or even the consumer. In one of the cases arising out of the capture of The Sarah, I mean that against Groning, the property is libelled in the hands of a purchaser without notice, after it was landed in this country. If we can go so far, I see not where we are to stop. Every subsequent purchaser, even the remotest, as far as the article will admit of identification, is in no better situation than the defendant Groning, and liable, upon the same principle, to be dispossessed. After going beyond the fact of seizure by sovereign authority within his own territory, (where he is supreme,) or upon the ocean, (where he is equal to all others,) unaffected by escape, recapture or release, (by which property is restored to its state before seizure,) the approbatory sentence of his own court  (by which alone it can be judicially known to be the act of the sovereign)  beyond these limits every step that a court takes can only be productive of doubt, litigation and uncertainty, and involve the commercial world in endless embarrassment, at the same time that it compromits the peace of nations, among whom it is a received and correct opinion, that a want of due deference to the jurisdiction of their maritime courts is a just cause of war.

Sentence of the Court, March 2, 1808.
This cause came on to be heard on the transcript of the record, and on sundry exhibits introduced into the case in this court, and was argued by counsel, on consideration whereof, it appearing that The Sarah with her cargo were seized without the territorial jurisdiction claimed by the French government of St. Domingo, for the breach of a municipal regulation, and having never been carried within that jurisdiction, were sold by the captor in a foreign port, and afterwards condemned by the court of St. Domingo, as having violated the laws for regulating the commerce of French and foreign vessels with that colony, which laws authorise a seizure of vessels found within two leagues of the coast; it is the opinion of the court, that the seizure of The Sarah and her cargo is to be considered as a marine trespass, not vesting the possession in the sovereign of the captor, or *293 giving jurisdiction to the court which passed the sentence of condemnation, and, therefore, that the said sentence did not change the property in The Sarah and her cargo, which ought to be restored to the plaintiffs, the original owners, subject to those charges of freight, insurance and other expenses which would have been incurred by the owners in bringing the cargo into the United States, which equitable deductions the defendants are at liberty to show in the circuit court. This court is therefore of opinion, that the sentence of the circuit court of South Carolina ought to be reversed, and the cause be remanded to that court, in order that a final decree may be made therein, conformably to this opinion.
NOTES
[*] This case was argued in connexion with the case of Rose v. Groening, which was a libel for another part of the cargo of the Sarah; and with the case of La Font v. Bigelow, from Maryland, which was an action of replevin by the original owner of goods condemned by the tribunal at Santo Domingo, under similar circumstances; and with the case of Hudson and Smith v. Guestier, also from Maryland, which was trover for the cargo of the Sea Flower, condemned upon similar grounds; and with the case of Pulmer and Higgins v. Dutilgb, from Pennsylvania, which was replevin for the cargo of the brig Ceres, condemned under similar circumstances; and with the case of Pluyment v. The Brig Ceres, which was a libel in the district court of the United States a Philadelphia, for restoration of the vessel. These cases were all supposed to depend on the same questions, and by consent of counsel, with leave of the court, were argued as one cause. This accounts for the great number of the counsel employed, and for the great length of the argument, which consumed nine days.

Upon the opening of these cases, six judges being present, it appeared that three of the six judges had given opinions in the circuit court upon the principal points which were about to be argued, and that if each judge who had given an opinion, should withdraw from the bench, as had been customary heretofore, there would not remain a quorum to try the cause. It was thereupon agreed by all the judges that they would sit. Chase, Johnson, and Livingston, Justices, expressed themselves strongly against the practice of a judge's leaving the bench because he had decided the case in the court below. Washington, Justice, said he should not insist upon the practice, if it should be generally abandoned by the judges The whole six judges (Todd, Justice, being absent) sat in the cause; so that the practice of retiring seems to be abandoned.